555 P.2d 136

**STATE of New Mexico, Petitioner,**

v.

**Charles DRISCOLL, Respondent.**

**No. 10811.**

Supreme Court of New Mexico.

Sept. 24, 1976.

Toney Anaya, Atty. Gen., Ralph W. Muxlow II, Asst. Atty. Gen., Santa Fe, for petitioner.

Melvin L. Robins, Paul A. Phillips, Albuquerque, for respondent.

## OPINION

OMAN, Chief Justice.

This case is before us on a writ of certiorari directed to the New Mexico Court of Appeals, which reversed the conviction and sentence of defendant (Driscoll) for contempt of court and remanded with instructions to the district court to dismiss the information. *State v. Driscoll,* No. 2081 (Ct.App., January 27, 1976). We reverse the Court of Appeals, reverse the conviction and sentence, and remand the cause to the district court for further proceedings consistent with this opinion.

In its opinion, the Court of Appeals quoted from the transcript on appeal a portion of the recorded proceedings in the district court presided over by Judge Ryan. It was these proceedings which led to Judge Ryan's directive to the court bailiff to take Driscoll to jail. This act by Judge Ryan in directing that Driscoll be taken to jail, if it constituted a summary adjudication of and sentence for contempt, as held by the Court of Appeals, necessarily concerned itself only with the conduct of Driscoll which preceded that adjudication and sentence. Thereafter, Driscoll continued to conduct himself in a manner which could clearly have been found to be contemptuous by the district judge (Judge Traub) who subsequently tried Driscoll upon the charges of contempt set forth in the information. Judge Traub found him guilty and sentenced him to ten days in jail. It was this judgment of conviction and sentence by Judge Traub from which Driscoll appealed.

In a short paragraph in which it made reference to some of this misconduct, the Court of Appeals apparently accepted the subsequent explanation by Driscoll that his removal of "his coat and tie" constituted a symbolic demonstration that he was from that point on a prisoner and not a lawyer. That court also stated that Driscoll, after referring to Judge Ryan as a liar and as being sick, "assumed a position of passive resistance and was carried to jail."

■ We do not believe that the evidence can properly be viewed so restrictively on appeal. It is the duty of an appellate court, in reviewing a judgment of conviction, to view the evidence in the light most favorable to the judgment, resolving all conflicts therein and indulging all permissible inferences therefrom in support of the judgment. *State v. Lucero,* 88 N.M. 441, 541 P.2d 430 (1975); *State v. Vigil,* 87 N.M. 345, 533 P.2d 578 (1975); *State v. Gregg,* 83 N.M. 397, 492 P.2d 1260 (Ct. App.), cert. denied, 83 N.M. 562, 494 P.2d 975 (1972); *State v. Parker,* 80 N.M. 551, 458 P.2d 803 (Ct.App.), cert. denied, 80 N.M. 607, 458 P.2d 859 (1969).

In his opening statement to the jury in a criminal case in which his client was charged with two counts of robbery, Driscoll, in referring to a lineup identification of his client by three victims of the robberies, stated that one such victim had failed to identify the client as the robber, the second had identified "the wrong man" (someone other than the client), and the third had identified the client as the robber, but, "two days ago signed an affidavit that she did not want to prosecute." Thereupon, the following occurred:

"MR. HARRIS [prosecutor]: Your Honor, I move for mistrial—

"THE COURT: Mr. Driscoll—

"MR. HARRIS: —at this time.

"MR. DRISCOLL: That's a question that—

"THE COURT: Mr. Driscoll, that has —

"MR. DRISCOLL: I ask—

"THE COURT: That has nothing to do with this case.

"MR. DRISCOLL: It's got everything to do with the case, that's a subject for cross-examination and impeachment of the

witness, Your Honor, and I intend to present evidence—

"THE COURT: Don't argue with me, Mr. Driscoll. That has nothing to do with the case whatsoever. I will take under advisement the motion for mistrial. Continue.

"MR. DRISCOLL: I am not going to continue. I have nothing more to say to the jury, the evidence will reveal itself and I respectfully except to the threatening attitude and gestures of the court. I feel that I am being harrassed [sic] and I find it difficult under those circumstances to adequately represent my client. The Court is obviously laboring under extreme emotion and I, myself, am now laboring under extreme emotion. I think the Court is completely wrong in its ruling and I want that entered and made a matter of record. And I would ask for a recess at this time.

"THE COURT: No, I am going to declare a mistrial (to bailiff) and will you take Mr. Driscoll directly up to jail, please. The jury will be excused from—

"MR. DRISCOLL: You are going to do it by force and I mean by force. I AM NOT GOING!

(Mr. Driscoll removes coat, tie, throws glasses and pencil on the floor; walks toward the Bench; then walks over and stands at end of jurybox, leaning on end rails of jurybox.)

"MR. HARRIS: Your Honor, I ask that the jury be excused.

"THE COURT: The jury will be excused. Mr. Driscoll, get away from the jurybox.

(Jury departs the Courtroom.)

"THE COURT: Does the record adequately reflect the conduct of Mr. Driscoll?

"MR. HARRIS: Yes, sir.

"THE COURT: Does the record indicate that at the time he said that he was not going that he took off his tie and took off his coat and approached toward the Bench in a fighting attitude?

"MR. DRISCOLL: That's a lie and you know it's a lie. You're sick.

"THE BAILIFF (Emiliano Montoya): Okay, that's enough, that's enough, Mr. Driscoll.

"THE COURT: Mr. Harris, is that approximately what you observed?

"MR. HARRIS: I really wasn't watching, Your Honor, after he took off his tie and his coat; I know that he eventually ended up near the jurybox.

"THE COURT: He eventually ended up near the jurybox but he started with a motion towards the Bench. I can't tell whether it is directed at me quite or not but it was in a combative attitude.

"MR. HARRIS: Yes, I cannot say that it was directed toward the Court but I think that it was directed toward the fact that he was not going to leave the Courtroom, that he would have to be taken by force.

"MR. DRISCOLL: Let the record reflect that without my coat and without my tie I approached the jurybox to grab some place to hold on to; I am not going voluntarily, I am going to be taken up by force. I am now standing by the witnessbox and I am still insisting that I am not going to go up voluntarily, that I am only going to go up if I am taken up by force. The conduct of the Court is outrageous.

"THE DEPUTY SHERIFF: Sir, you are going up, do you want to go voluntarily or do you want to be handcuffed?

(Mr. Driscoll backs off from officers.)

" * * *.

"THE COURT: Are you going to go up to jail quietly?

"MR. DRISCOLL: I am not, sir, absolutely not going to go up voluntarily, you are going to have to take the responsibility of ordering people to do it by force and accept the responsibility for the pushing around that we have been subjected to. This just dramatizes it in a particular individual way what has been going on here for a long time and I, at this time, am

going to take a position of passive resistance.

(Witness sits flat down on the floor, later laying in a prone position as the officers approach.)

"THE COURT: Take him away.

"MR. DRISCOLL: I would ask Mr. Herrera to watch the violence being perpetrated and to keep in touch with me as long as you can.

(Mr. Driscoll engages his feet flat on the rug making the officers pull him while in a semi-prone or a sitting position, but is finally removed from the Courtroom.)

"MR. HARRIS: Your Honor, I would like the record to reflect, I think there were some attorneys here who were witnesses to this entire thing, Mr. Scorza, from our office, and Mr. Patrick Kennedy, from our office; I believe there is also Mr. Pasternack, who is a newspaper reporter. I don't know how much all of these people saw, I think that it ought to be on the record that they were present.

"THE COURT: Yes. Gentlemen, will you come forward.

(Four men and one woman come to the Bench.)

"If it is necessary to have a hearing, you will probably be the necessary witnesses as to what happened.

" *   *   *.

"THE COURT: And my bailiff, Emiliano, you saw what happened, what transpired. We will have to set a hearing. When would you suggest, Mr. Harris?

"MR. HARRIS: Is the Court finding Mr. Driscoll in contempt of Court?

"THE COURT: Yes.

"MR. HARRIS: This should be on the record.

"THE COURT: I am finding him in contempt. There will be a hearing, I will set the hearing; when would it be most convenient for you all, tomorrow morning?

" *   *   *.

"MR. HARRIS: I think if we could set it later, I think Mr. Driscoll will need representation.

"THE COURT: He can post bond; I will set bond, he is an officer of the Court —I think he lost that—I think that I will set a bond of a hundred dollars. I think when he calms down we can release him, this afternoon when he calms down, but I think he should stay until he calms down.

"I need to discharge the jury. Bring in the jury.

(WHEREUPON, the jury returned to the Courtroom and the following proceedings were had:)

"THE COURT: Unfortunately I had to call a mistrial, so you will be excused for the rest of the day and I don't know when you are to come back. All of you saw what happened, not all of it but at least the start of it, didn't you?

(Jurors nod affirmatively.)

JUROR O'BRIEN: I thought he was going to hit you.

"JUROR WELLS: He was really mad.

"THE COURT: Yes, he got a little mad, I think there was some Irish blood in his background, two days after St. Partick's Day. Well, I will excuse you, we have your names, if they need any of you as witnesses as to what you saw, why then we can call you.

"JUROR O'BRIEN: Do we appear at 9:00 o'clock in the morning?

"THE COURT: Did it appear to you, Lee, that he was going to attack me?

"JUROR O'BRIEN: Yes, indeed it did.

"JUROR WELLS: Yes, he looked like he was mad.

"JUROR O'BRIEN: I thought so because he got up, ripped off his coat, ripped off his tie and came over there and started approaching you but he couldn't do anything from this side with the Bench having the wall there. If he'd gone to the other side, I don't know what would have happened."

Although the transcript on appeal fails to reflect the precise time of day when the foregoing occurred, it is apparent that it occurred at about 11:00 a. m. on March 19, 1975. At 1:30 p. m. of that day, Driscoll appeared in court and conferred with his counsel. Then he stated to Judge Ryan that "when the Court, in effect, without saying it in so many words, held me in contempt and ordered me to be sent upstairs * * *" that constituted a turning point in the proceedings, that his conduct in removing his coat and tie was a "symbolic act," and that he did not mean his conduct as a personal attack upon the court. He stated he was sorry for having said something about Judge Ryan being sick, "but for what I did before that I am not sorry and if I had the opportunity or chance or the need to do it again, I am afraid I would do it again * * *."

After some further discussion between Judge Ryan and Driscoll, the judge stated: "What I will do, Mr. Driscoll, is release you on your own recognizance and refer the matter to some other Judge for hearing at the appropriate time on the contempt charge."

Some few further remarks were made by both the judge and Driscoll, and then the judge announced: "So that will be the end of my participation in the case. You are released on your own recognizance but it will be taken up at a later time before some other Judge."

On the following day, March 20, 1975, Judge Ryan entered an order commanding Driscoll to appear before Judge Traub on March 26, 1975 to show cause why he should not be punished for contempt, and that, if contempt were found, a sentence in excess of six months in jail or a fine in excess of $1,000 would not be imposed.

▮ We have heretofore recognized that proceedings in criminal contempt may be initiated by a motion or order to show cause. *Seven Rivers Farm, Inc. v. Reynolds*, 84 N.M. 789, 508 P.2d 1276 (1973). However, on March 24, 1975, an informa-

tion was filed by the office of the district attorney in which it was charged that Driscoll had committed acts of contempt of court in that he did and said the things above recited, "and * * * by refusing to proceed with the trial, when lawfully ordered to do so, and by refusing to submit to incarceration for contemptuous conduct, and by disrespectful language to the Judge, did by words and acts belittle, degrade, and embarrass the Court and impede the due administration of justice."

Driscoll was arraigned on the charges contained in the information, pleaded not guilty, and was tried before Judge Traub on those charges on April 7, 1975. He was found guilty, a judgment was entered accordingly, and he was sentenced to jail for a period of ten days.

One of his contentions at trial was that he had already been summarily tried, convicted and sentenced by Judge Ryan, and, therefore, was being subjected to double jeopardy by trial upon the charges contained in the information. Judge Traub rejected this contention and found:

"[T]hat a fair reading of a portion of the transcript attached to the motion [which is substantially the same as quoted above] is to the effect that Judge Ryan felt that a hearing was necessary on the contempt proceeding and in that context it was not a completed act and it's more consistent with a ruling by Judge Ryan that he was citing Mr. Driscoll for contempt * * *."

However, the Court of Appeals was persuaded that Driscoll had been summarily convicted and sentenced to jail for contempt by Judge Ryan upon the same grounds and for the same conduct with which he was charged in the information and for which he was subsequently convicted by Judge Traub.

▮ We are of the opinion that Judge Traub's appraisal of the effect of the actions of Judge Ryan was probably correct. However, to avoid any question of double jeopardy and to give Driscoll the benefit

of all doubt, we hold that Judge Ryan's order to take Driscoll to jail, immediately following the declaration of a mistrial, did constitute an exercise by the judge of his power to summarily adjudge and punish for the contemptuous conduct which had preceded that adjudication and sentence. No appeal was taken from that adjudication or sentence.

As shown above, after the summary adjudication of contempt and after further improper conduct by Driscoll, which was charged in the information as being contemptuous, Judge Ryan, in response to an inquiry, did say he was finding Driscoll in contempt. In our opinion, this must have related to the earlier summary adjudication and sentence, because no further punishment was imposed. Driscoll was already in jail, and the actions and statements of Judge Ryan, after initially ordering Driscoll to jail, indicated that the issue of the guilt or innocence of Driscoll for his alleged subsequent contemptuous conduct would later be tried before another judge. This was a proper procedure for Judge Ryan to follow under the circumstances. See *Mayberry v. Pennsylvania*, 400 U.S. 455, 463–464, 91 S.Ct. 499, 504, 27 L.Ed.2d 532, 539 (1971); *Cooke v. United States*, 267 U.S. 517, 539, 45 S.Ct. 390, 395–96, 69 L.Ed. 767, 775 (1925); *Wollen v. State*, 86 N.M. 1, 518 P.2d 960 (1974).

■ Obviously an attorney, or anyone else, may be guilty of a series of successive contempts of court during one trial or one proceeding. Driscoll concedes as much in his brief, stating, " * * * it is possible for an attorney to commit successive and separate acts of contempt in the same trial." See *Mayberry v. Pennsylvania*, supra; In re Dellinger, 370 F.Supp. 1304 (N.D.Ill.1973), aff'd 502 F.2d 813 (7th Cir. 1974), cert. denied, 420 U.S. 990, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

■ Separate, successive contempts are punishable as separate offenses. *United States v. Gebhard*, 426 F.2d 965, 968 (9th Cir. 1970); *Bullock v. United States*, 265 F.2d 683, 695 (6th Cir.), cert. denied, 360 U.S. 909, 79 S.Ct. 1294, 3 L.Ed.2d 1260 (1959); *Donovan v. Superior Court*, 39 Cal.2d 848, 250 P.2d 246 (1952); *Blodgett v. Superior Court*, 210 Cal. 1, 290 P. 293 (1930); *Application of Stafford*, 160 Cal. App.2d 110, 324 P.2d 967, cert. denied, 358 U.S. 913, 79 S.Ct. 242, 3 L.Ed.2d 233 (1958); 17 C.J.S. Contempt § 100 (1963).

■ The final question to be decided is whether the conviction of Driscoll by Judge Traub can properly be permitted to stand, since the judgment of conviction does not expressly negative the possibility that the conviction was based, in whole or in part, upon the same misconduct for which Driscoll was summarily convicted of contempt and sentenced to jail by Judge Ryan, as above discussed. Clearly, the charges in the information upon which Driscoll was arraigned and tried before Judge Traub, and the evidence adduced at the trial, included this misconduct. It is well established constitutional law that a person may not be charged, convicted or punished for the identical misconduct or offense with which he has been previously charged and convicted. U.S.Const. amend. V; *Colombo v. New York*, 405 U.S. 9, 92 S.Ct. 756, 30 L.Ed.2d 762 (1972); *People v. Colombo*, 31 N.Y.2d 947, 341 N.Y.S.2d 97, 293 N.E.2d 247 (1972); N.M. Const. art. II, § 15; *State v. Tanton*, 88 N.M. 333, 540 P.2d 813 (1975); *State v. Baros*, 78 N.M. 623, 435 P.2d 1005 (1968); *State v. McAfee*, 78 N.M. 108, 428 P.2d 647 (1967); *State v. Quintana*, 69 N.M. 51, 364 P.2d 120 (1961); *State v. Everitt*, 80 N.M. 41, 450 P.2d 927 (Ct.App.1969).

Since we cannot be sure from the judgment of conviction that Driscoll was not convicted by Judge Traub for the same misconduct for which he was summarily convicted and sentenced by Judge Ryan, we cannot be sure that Driscoll's rights against double jeopardy have not been violated. Consequently, we believe the only proper procedure to be followed to protect against this possible violation of his rights, and to protect the rights of the public to

have contempts of court punished, is to reverse the decision of the Court of Appeals, reverse the judgment and sentence of the district court, and remand this cause to the district court for further proceedings consistent with this opinion. See *Eaton v. Tulsa*, 415 U.S. 697, 94 S.Ct. 1228, 39 L. Ed.2d 693 (1974); *Street v. New York*, .394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); *Williams v. North Carolina*, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942); *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).

The decision of the Court of Appeals is reversed, the judgment and sentence of the district court are reversed, and this cause is remanded to the district court for further proceedings consistent herewith.

IT IS SO ORDERED.

McMANUS, MONTOYA, SOSA and EASLEY, JJ., concur.